IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

BECKLEY DIVISION

**NORMAN J. FORD**,

        **Petitioner,**

v.                                     Case No.: 5:20-cv-00455

**D. L. YOUNG,**
Warden, FCI Beckley,

        **Respondent.**

**PROPOSED FINDINGS AND RECOMMENDATIONS**

Pending before the Court are Petitioner Norman J. Ford's *pro se* Petition for Writ of Habeas Corpus under 28 U.S.C. § 2241, (ECF No. 2), and Respondent's Motion to Dismiss. (ECF No. 10). This matter is assigned to the Honorable Frank W. Volk, United States District Judge, and by standing order has been referred to the undersigned United States Magistrate Judge for total pretrial management and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons that follow, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Ford's Petition for a Writ of Habeas Corpus, (ECF No. 2); **GRANT** Respondent's Motion to Dismiss, (ECF No. 10); and **DISMISS** this action, with prejudice, and remove it from the docket of the Court.

**I.**    **Relevant Facts and Procedural History**

On August 23, 2019, when Ford was an inmate at Federal Correctional Institution ("FCI") Beckley, he received an Incident Report from Officer J. B. Bailey for violating

1

Prohibited Act Codes 113 (possession of narcotics and paraphernalia) and 199 (conduct which disrupts or interferes with the security or orderly running of the institution or the Bureau of Prisons ("BOP")). (ECF No. 10 at 4). The Incident Report stated as follows:

> At approximately 7:15 p.m. I officer JB. Bailey, Poplar B Lower unit Officer, was conducting rounds throughout the unit. As I began walking on the top tier coming to cell 222 belonging to Inmates A and Ford, Norman, Reg. (08445-085) Inmate B was the lookout guy. Inmate B told Inmate A and Ford I was coming. I stopped at the cell and questioned Ford and A what they was doing acting suspicious. Inmate Ford stated "Nothing just in here" as Ford was standing in front of his open locker. I continued 1 cell down and Ford stepped out and said Bailey, so I back tracked back to the cell and told Inmates Ford and A to step out I was going to search the cell. Inmate Ford turned his back to me blocking the cell door so Inmate A could try and grab something out of Ford's locker. I gave direct orders for Ford to move from the doorway before I took my right arm and pushed him out of the way to enter the cell to search it. After the Inmates came out of the cell I entered and began searching Inmate Ford's unsecured wall locker. I began searching the top right shelf of the unsecured wall locker and I found a homemade syringe full with a substance inside made out of a Ink pen. The syringe was made up out of a emptied out pen with a hollow out bore hypodermic needle melted to the end of the pen. The white ink holder had a silver flat head screw on top to push the substance through the end of the pen. It contained a rubber piece on the inside so the substance could flow through without leaking out. I asked Inmate A what was inside of it and he stated "Suboxone." I notified Operations Lieutenant and Compound of the finding and was sent to the Lieutenants Office. I continued my search of the cell and finished up. End of Report.

(ECF No. 10-1 a4 14). The Incident Report was forwarded to the Unit Discipline Committee ("UDC"), which held a hearing. At the hearing, Ford maintained that the Suboxone-filled needle did not belong to him, and that he moved when instructed to do so by the officer. (*Id.*). The UDC referred the charges to the Disciplinary Hearing Officer ("DHO") for further consideration. (*Id.*).

On August 28, 2019, Ford was provided a Notice of Discipline Hearing Before the DHO. The Notice advised Ford that he was accused of "possessing drugs/alcohol" and "disrupting conduct-greatest severity." (ECF No. 10-1 at 17). Ford requested to have a staff representative present at the DHO hearing and also wanted to offer witnesses. (*Id.* at 17).

2

Ford was provided with a statement of his inmate rights, and acknowledged receipt of them. (*Id.* at 19).

The DHO held a hearing on September 27, 2019. (*Id.* at 21-24). Senior Officer Specialist ("SOS") J. White was present as Ford's staff representative. (*Id.*). At the DHO hearing, Ford waived his right to witnesses, but requested that the camera footage of the incident be reviewed prior to the hearing. (*Id.*). SOS White contacted N. Manning, a special investigative services technician, who confirmed that all surveillance footage from the time frame had been "purged from the system." (ECF No. 10-1 at 21-24). Ford gave a statement at the hearing denying that the needle was his and that he disrupted Officer Bailey from inspecting his cell. Ford indicated that the needle and drug belonged to his cellmate, and his cellmate had placed them in Ford's locker without permission, stating: "The paraphernalia and the drugs were not mine. My cellmate told you it was his. My cellmate put the drugs in my locker for some reason. I did not ty to keep the officer from coming inside the cell. When he told me to move, that is what I did." (*Id.*).

Notwithstanding Ford's statement, the DHO gave greater weight to the factual account detailed in the Incident Report by Officer Bailey. (*Id.* at 23). The DHO acknowledged that Ford's cellmate had accepted responsibility for the needle and drug, but noted that the items were found inside Ford's locker. The DHO was unpersuaded that Ford's cellmate had concealed the drug-filled needle in Ford's locker without his knowledge, because Ford was present during the entire incident. The DHO also surmised that Ford had obstructed Bailey's entrance into the cell to give his cellmate time to hide the needle. The DHO found that Ford committed the prohibited act of 113—possessing drugs or related paraphernalia—but concluded that the elements necessary to sustain a violation of 199 were not met. (ECF No. 10-1 at 21-24).

Ford was sanctioned and disallowed 41 days of Good Conduct Time ("GCT"), phone privileges for four months, and commissary for three months. (*Id.* at 24). He appealed the decision to the BOP's Mid-Atlantic Regional Office in Annapolis Junction, Maryland. (ECF No. 2 at 2). In his first appeal, he argued that there was not a sufficient factual basis to support the DHO's ruling, as his cellmate admitted that any drugs or contraband found in the cell belonged to him, and not to Ford. (*Id.*). Ford claimed his Fifth and Fourteenth Amendment rights were violated by the DHO. (ECF No. 2 at 2.). When this appeal was denied, Ford appealed to the BOP's Central Office in Washington D.C. (*Id.* at 3). In that appeal, he argued the same issues raised in his first appeal, but added that the DHO "unconstitutionally relied on improperly introduced evidence in which there was insufficient evidence" to support the result of the DHO hearing. (*Id.*). Ford's appeal was again denied.

### A. Ford's Petition

On July 2, 2020, Ford filed his Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241. (ECF No. 2). In his petition, Ford challenges "the decision and sanctions imposed, to wit." (*Id.* at 2). He claims that he has been "falsely accused and unjustifiably adjudged guilty" of committing Prohibited Act Code 113, although the DHO had no evidence or facts to support his ruling. (*Id.*). Ford extrapolates in three grounds for relief.

In Ground One, Ford contends that there was clearly a "lack of factual basis" contained in the Incident Report to "support a finding of guilty" by the DHO. (*Id.* at 6). As support for this ground, he emphasizes that his cellmate claimed responsibility for any contraband or drugs found in their cell. (*Id.*). Ford argues that the DHO violated 28 C.F.R. §§ 541.1-541.3 and should have expunged the Incident Report based on the cellmate's confession. (ECF No. 2 at 6). In Ground Two, Ford claims that the UDC, comprised of

4

unit counselor and case manager submitted prejudicial, irrelevant, immaterial, and inappropriate evidence at both the UDC and DHO hearings. (*Id.*). The proceedings were, as Ford alleges, conducted in violation of his Fifth and Fourteenth Amendment rights, citing *Lathrop v. Brewer*, 340 F. Supp. 873, (S.D. Iowa Apr. 3, 1972) (*Id.*). He again asserts that there was insufficient evidence to support a finding of guilt. (*Id.*). In Ground Three, Ford claims that there was no intent on his part to break a BOP rule, policy, or regulation. (ECF No. 2 at 6). In addition, he contends BOP staff can substantiate that his cellmate had a documented history of drug abuse and possession of illegal drugs while incarcerated. (*Id.*). Ford asserts that he was not inside the cell during the time of the search, but he was instead in another section of the housing unit with a correctional officer present. (*Id.*).

Ford requests the Court to issue an order directing the BOP to expunge the Incident Report from his BOP Central File. (*Id.* at 7). He also asks that any sanctions imposed by the DHO be reversed, including the deduction of 41 days of GCT. (*Id.*).

B.  **Respondent's Motion**

On October 2, 2020, Respondent filed his Motion to Dismiss Ford's petition. (ECF No. 10). According to Respondent, Ford received all the due process safeguards afforded to him by *Wolff v. McDonnell*, 418 U.S. 539 (1974) (*Id.* at 7). Those safeguards include: (1) written notice of the charged violations at least twenty-four hours before the hearing; (2) disclosure of evidence against the prisoner; (3) the right to call witnesses and present documentary evidence (unless unduly hazardous to institutional safety or correctional goals); (4) a neutral and detached hearing body; and (5) a written statement by the factfinders as to evidence relied on and reasons for disciplinary action. *Wolfe*, 418 U.S. at 559-566. Respondent claims that a review of the disciplinary action reveals that the *Wolff*

requirements were satisfied in this case. (ECF No. 10 at 8). He contends that Ford received a written notice of the charges at least twenty-four hours in advance of the DHO hearing. (*Id.*). Ford was afforded the opportunity to make a statement on his own behalf at the DHO hearing, and, in fact, made a statement. (*Id.*). As to the third requirement, Ford waived his right for witnesses to be present at the hearing. (*Id.*). Furthermore, he requested that the camera footage be viewed, but all camera footage from the relevant time period had been overwritten on the computer system in accordance with the BOP's practice. (ECF No. 10 at 8). Respondent cites *Anderson v. FCC Coleman-USP II Warden*, 649 Fed. Appx. 730, 731 (11th Cir. 2016), which finds that no due process violation occurs where the "record indicates that video of the incident does not exist." (*Id.*). Respondent contends that based on the evidence and Ford's admissions, the DHO found that Ford committed a violation of Prohibited Code 113, Possession of Drugs or Paraphernalia. (*Id.*).

Additionally, Respondent argues, Ford had a neutral and detached hearing provided by the DHO, as evidenced by the DHO report. (*Id.* at 9). Ford was also provided a copy of the DHO report on October 18, 2020, and, therefore, the *Wolff* requirements were fully satisfied. (*Id.*). Respondent requests that this Court dismiss the instant petition. (*Id.*).

  **C. Ford's Memorandum in Opposition to Respondent's Motion to Dismiss**

On December 14, 2020, Ford filed his Reply Memorandum to Respondent's Motion to Dismiss. (ECF No. 14). In his memorandum, he again moves this Court to issue an order "directing the [BOP] to expunge Incident Report Number 3295640 from Ford's BOP Central file." (*Id.* at 2). He also requests that his 41 days of GCT be reinstated. (*Id.*). According to Ford, Respondent's motion to dismiss failed to include the fact that Ford's

6

cellmate appeared at Ford's UDC hearing on August 28, 2019 and admitted that the drugs and paraphernalia belonged solely to him. (*Id.* at 3). As such, Ford argues that the DHO and UDC "neglected to consider the voluntary confession offered by inmate Jason King, Reg. No. 14530-032, when assuming full responsibility for any substances, drugs, or paraphernalia discovered by FCI Berkely Correctional Officer JB Bailey." (ECF No. 14 at 4). Furthermore, he contends that the finding of guilty "could not possibly have been based upon the evidence detailed in Section V of the DHO Report." (*Id.* at 4-5). Ford denies the assertion that he "attempted" to place sole responsibility for the illegal drugs and paraphernalia on his cellmate, pointing out that his cellmate confessed to the violation and exonerated Ford. (*Id.* at 5). Ford again contends that the DHO violated 28 C.F.R. §§ 541.2-541.3. (*Id.*). He further asserts that Officer Bailey's accusation of Ford acting "suspiciously" is based on "nothing but mere conjecture and supposition of Bailey when looking quickly into cell 222." (*Id.* at 5-6).

Moreover, Ford claims that the unavailable video footage of the incident would prove that he was not blocking Officer Bailey's attempt to enter the cell, but rather show that he was "standing against the handrailing" when Officer Bailey approached and entered the cell. (*Id.* at 6). He also contends that the missing video footage would exculpate him from any illegal activity altogether, and the deletion of such video "unquestionably infringed upon his substantive rights," citing *Chavis v. Rowe*, 643 F.2d 1287 (7th Cir. 1981). (*Id.* at 6-7). Ford asserts that his due process rights have been violated by the unavailability of the video footage, and once SOS White was assigned as his staff representative, there should have been no problem securing a copy of the video. (*Id.* at 7). He claims that since the Supreme Court's decision in *Sandin v. Conner*, 515 U.S. 472 (1995), numerous courts have held that the deprivation of good time credit requires

due process protections and limit prison officials' discretion from taking good time credit from inmates. (*Id*. at 8). Ford alleges that the minimum requirements of due process stated in 28 C.F.R. § 541.17(f) and 42 U.S.C. § 1983 were not met by the DHO hearing. (*Id*. at 9). He also asserts that the DHO "failed to make findings of fact with regards to specific acts of misconduct." (*Id*.). According to Ford, there was not "sufficient substantial evidence" to support the DHO hearing's findings. (ECF No. 14 at 11). He concludes his memorandum by again arguing that his Fifth and Fourteenth Amendment rights have been violated and requests the Court to dismiss Respondent's Motion to Dismiss and allow his habeas corpus petition to proceed. (*Id*. at 11-12).

## II.     **Standard of Review**

Respondent does not identify the standard under which he seeks dismissal of Ford's petition; however, Respondent filed the response concurrently with the request for dismissal. Therefore, the request should be treated as a motion for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure. *See Walker v. Kelly*, 589 F.3d 127, 139 (4th Cir. 2009). A motion for judgment on the pleadings applies the same standard of review as a motion to dismiss filed under Rule 12(b)(6), and both motions may be filed in habeas actions. (*Id*. at 138–39); *see also Martin v. U.S. Parole Comm'n*, No. cv PWG-17-3335, 2018 WL 2135009, at *1 (D. Md. May 9, 2018).

When deciding a motion for judgment on the pleadings, the court must accept all well-pleaded allegations of the petition as true and "draw all reasonable factual inferences" in favor of the petitioner. *See Massey v. Ojaniit*, 759 F.3d 343, 353 (4th Cir. 2014); *Wolfe v. Johnson*, 565 F.3d 140, 169 (4th Cir. 2009). Nonetheless, the court is "not obliged to accept allegations that 'represent unwarranted inferences, unreasonable conclusions, or arguments,' or that 'contradict matters properly subject to judicial notice

8

or by exhibit.'" *Massey*, 759 F.3d at 353 (quoting *Blankenship v. Manchin*, 471 F.3d 523, 529 (4th Cir. 2006)). A court presented with a motion for judgment on the pleadings in a federal habeas case must consider "the face of the petition and any attached exhibits." *Walker*, 589 F.3d at 139 (quoting *Wolfe*, 565 F.3d at 169) (internal markings omitted). In addition, the court may consider "matters of public record," including documents from prior or pending court proceedings, when resolving the motion without converting it into a motion for summary judgment. (*Id.*) The court "may also consider documents attached to the complaint ... as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic." *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).

### III.   Discussion

After Ford filed his habeas petition, but before the Court could consider it, Ford was released from prison. *BOP Inmate Locator* at https://www.bop.gov/inmateloc (showing that Ford was released from custody on March 24, 2021). As a prerequisite to addressing the merits of Ford's petition, this Court must have subject matter jurisdiction over the dispute pursuant to Article III of the United States Constitution. Even when no party has raised the issue of subject matter jurisdiction, the Court must consider it. Article III allows federal courts to adjudicate "only actual, ongoing cases or controversies." *Lewis v. Continental Bank Corp.,* 494 U.S. 472, 477 (1990) (citations omitted). Consequently, "[t]o be justiciable under Article III of the Constitution, the conflict between the litigants must present a 'case or controversy' both at the time the lawsuit is filed and at the time it is decided. If intervening factual ... events effectively dispel the case or controversy during pendency of the suit, the federal courts are powerless to decide the questions presented." *Ross v. Reed*, 719 F.2d. 689, 693-94 (4th Cir. 1983); *also Arizonans for Official English*

*v. Arizona*, 520 U.S. 43, 68 n.22 (1997) (citations omitted) ("The requisite personal interest that must exist at the commencement of the litigation … must continue throughout its existence."). In other words, a case no longer presents a justiciable controversy—and thus becomes moot—when it is "impossible for [the] court to grant any effectual relief whatever to a prevailing party." *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (quoting *Knox v. Service Employees*, 567 U.S. 298, 307 (2012)).

It is well-settled that a prisoner must be in custody at the time he brings a petition for a writ of habeas corpus. *Leonard v. Hammond,* 804 F.2d 838, 842 (4th Cir. 1986). Although his subsequent release will not deprive the court of subject matter jurisdiction, "[t]he question of mootness is separate and distinct from the jurisdictional issue." *Id*. Generally, the transfer or release of a prisoner renders moot any claims for injunctive or declaratory relief. *See Rendelman v. Rouse*, 569 F.3d 182, 186 (4th Cir. 2009); *Incumaa v. Ozmint*, 507 F.3d 281, 286–87 (4th Cir.2007). As such, when a federal prisoner files a habeas corpus petition seeking an earlier release from incarceration, his release may render the petition moot.

However, there are two exceptions to the mootness doctrine. *Leonard,* 804 F.2d at 842. First, under the "collateral consequences" exception, a habeas petition is not rendered moot after a petitioner is released from custody where the petition challenges collateral consequences that continue after expiration of the sentence. *Id.* Second, the "capable of repetition, yet evading review" exception prevents a petition from becoming moot when two elements are present: (a) the challenged action is too short in duration to be fully litigated before it ceases or expires, and (b) there is a reasonable expectation that the same petitioner will be subjected to the same wrongful action again. *Leonard,* 804 F.2d at 842 (citing *Weinstein v. Bradford,* 423 U.S. 147, 149 (1975)).

### A.      Exception to Mootness—Collateral consequences

Obviously, Ford did not raise the issue of collateral consequences, because he was still incarcerated at the time he filed his petition and reply memorandum. Nonetheless, the undersigned will consider them prior to recommending dismissal of the petition on the ground of mootness. Collateral consequences are presumed when a petitioner is attacking a conviction or sentence while the petitioner is still serving the sentence imposed for that conviction. *See United States v. Jackson,* 523 F.3d 234, 242 (3rd Cir. 2008). To demonstrate collateral consequences after the sentence has been served, the petitioner must show "some concrete and continuing injury other than the now-ended incarceration." *United States v. Ketter*, 908 F.3d 61, 65 (4th Cir. 2018). In *Ketter*, the United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") considered whether a term of supervised release constituted a collateral consequence sufficient to prevent a sentence challenge from becoming moot upon the petitioner's release from incarceration. Defendant Ketter contested his sentence on appeal as procedurally and substantively unreasonable, but was released from prison prior to appellate court review. *Id*. The United States argued that, because Ketter was no longer incarcerated, his claim was moot, notwithstanding that he continued to serve a term of supervised release. *Id*. at 65.

The Fourth Circuit rejected this argument, finding that a sentence, consisting of a term of incarceration followed by a term of supervised release, was a "unitary" sentence, and "a challenge to that sentence presents a live controversy, even though [the defendant] has served the custodial portion of that sentence." *Id*. The Fourth Circuit concluded that "[b]ecause of the reciprocal relationship between prison sentence and a term of supervised release, even when the prison term has ceased, a defendant serving a term of

11

supervised release has a 'legally cognizable interest in the outcome' of a challenge to his sentence." *Id.* at 65-66. (citation omitted). The Fourth Circuit further explained that "[a]lthough the underlying prison sentence has been served, a case is not moot when an associated term of supervised release is ongoing, because on remand a district court *could* grant relief to the prevailing party in the form of a shorter period of supervised release." *Id.* at 66.

Ford may still be serving a term of supervised release. Nonetheless, in this case, a term of supervised release is insufficient to sustain his habeas petition, given the nature of the claim raised and the inability of this Court to award Ford any relief even should he succeed on his habeas petition. "The question is not whether the petition, which challenges only the calculation of [Ford's] prison sentence, asserts a collateral consequence, but whether it asserts a *redressable* collateral consequence." *Rhodes v. Judiscak,* 676 F.3d 931, 933 (10th Cir. 2012). Ford does not challenge the validity of his conviction or sentence as imposed; rather, he brings this petition to dispute the outcome of a disciplinary hearing that resulted in a loss of GCT. It is clear that ordering the BOP to reverse the disciplinary sanction and reinstate Ford's lost GCT—which is the only relief this Court can grant—would be of no benefit to Ford.

The Supreme Court of the United States ("Supreme Court") considered a similar claim in *United States v. Johnson*, 529 U.S. 53 (2000). In that case, a defendant had been serving a custodial sentence in federal prison when two of his convictions were declared invalid, resulting in his immediate release from custody. *Id.* at 54. At the time of his release, the defendant had served more time in prison than he should have absent the invalid convictions. The defendant argued in the Supreme Court that the overserved time should be credited against his still valid term of supervised release, reducing its length.

12

*Johnson,* 529 U.S. at 54. Looking to the text of the statute governing supervised release, 18 U.S.C. § 3624(e), the Supreme Court ruled against the defendant, holding that his term of supervised release should remain unaltered. *Id.*

In reaching this determination, the *Johnson* Court found that the text of § 3624(e) makes clear "that a supervised release term does not commence until an individual 'is released from imprisonment.'" *Id.* at 57. The Supreme Court noted that "[a]ll concede [the defendant's] term of imprisonment should have ended earlier than it did," but concluded, "[i]t does not follow, however, that the term of supervised release commenced, as a matter of law, once he completed serving his lawful sentences." *Id.* at 58. The Supreme Court further reasoned that this determination was supported by the "purpose and design" of the supervised release statute. *Johnson,* 529 U.S. at 59. This is because "[s]upervised release fulfills rehabilitative ends, distinct from those served by incarceration." *Id.* Accordingly, "[t]he objectives of supervised release would be unfulfilled if excess prison time were to offset and reduce terms of supervised release." *Id.* Finally, the *Johnson* Court noted that the inequities presented "when an individual is incarcerated beyond the proper expiration of his prison term" could potentially be ameliorated by the statutory structure which allows the sentencing court to modify or reduce an individual's terms and conditions of supervised release "in the interest of justice." *Id.* at 60.

As the decision in *Johnson* makes clear, an individual is not automatically entitled to less supervised release simply because he has served a longer term of incarceration than he lawfully should have served. Likewise, recovered GCT cannot be credited to a term of supervised release, because the term of supervised release does not begin until the term of incarceration has expired. "Though interrelated, the terms are not interchangeable." *Id.* at 58-59. However, the aggrieved individual may request a modification or

13

termination of his term of supervised release in the "interest of justice" by filing a motion under 18 U.S.C. § 3583(e) with the sentencing court. *Johnson,* 529 U.S. at 60.

Because the decision to alter or end Ford's term of supervised release falls exclusively within the authority of the United States District Court for the Eastern District of Washington, this Court lacks subject matter jurisdiction to grant relief to Ford. As a result, the claim raised in the petition is moot, and the "collateral consequences" exception to mootness does not apply. *See Kokoski v. Small*, No. CIV.A. 5:07-0145, 2008 WL 3200811, at *3 (S.D.W. Va. Aug. 5, 2008) ("Neither of these issues has any collateral consequences on [the petitioner], as the amount of GCT credited towards [the petitioner's] prior sentences has no effect on the time he will serve on supervised release, or on any term of imprisonment he could receive in the future, should his supervised release be revoked."); *Adigun v. Rickard*, No. 1:18-CV-01368, 2019 WL 3995981, at *1 (S.D.W. Va. July 30, 2019), *report and recommendation adopted*, No. CV 1:18-01368, 2019 WL 3986352 (S.D.W. Va. Aug. 21, 2019) ("According to the BOP inmate locator, the petitioner was released from BOP custody... Accordingly, his request for relief can no longer be granted and his section 2241 petition and Motion to Reinstate Good Conduct Time Credit are moot."); *Southard v. Williams,* No. 2:15-CV-69, 2016 WL 3349320, at *4 (N.D.W. Va. June 15, 2016) ("Indisputably, efforts to have good conduct time restored once one is released from incarceration would be futile."); *Johnson v. Adams*, No. 2:04CV605, 2005 WL 2593525, at *1 (E.D. Va. Oct. 12, 2005) ("[The petitioner] was released from the Federal Bureau of Prisons on July 21, 2005. Therefore, his petition requesting a different calculation of his good conduct time is moot."); *Melendez v. Masselieno,* No. CIV.A. ELH-13-1864, 2014 WL 460848, at *4 (D. Md. Feb. 4, 2014) (inmate's release from prison rendered moot his challenge to the result of a disciplinary

hearing and request that GCT be restored); *Francis v. Maloney*, 798 F.3d 33, 38 (1st Cir. 2015) (petitioner's challenge to revocation of CGT was mooted by release from prison and overserved time could not be applied to term of supervised release due to the *Johnson* decision); *Scott v. Schuylkill FCI*, 298 Fed. Appx. 202, 204 (3d Cir. 2008) ("Thus, once [the petitioner] served the entire term of imprisonment and was released upon its completion, his good time credits ceased to have any effect."); *James v. Outlaw*, 142 Fed. Appx. 274, 275 (8th Cir. 2005) ("Having carefully reviewed the record, we conclude the case is moot: [the petitioner] was released from prison while the appeal was pending, return of the good-time credits at issue would have no effect on his current term of supervised release, and at this time we see no collateral consequences from the challenged disciplinary action."); *Williams v. Chester*, No. 08–3177, 2008 WL 4585465, at *1 (D. Kan. Oct.14, 2008) ("[G]ood conduct credits cannot be applied to reduce a term of supervised release."); *Chapple v. United States*, No. CV 19-18213 (AET), 2020 WL 614552, at *2–3 (D.N.J. Feb. 10, 2020) ("[A]ssuming *arguendo* that Petitioner had filed a motion to modify his 1-year term of supervised release from this Court, and was entitled to additional good-time credits, the Court would be unable to grant him any meaningful relief. In other words, a judicial finding that he was entitled to additional good-time credits would have no effect on his term of supervised release. Accordingly, to the extent Petitioner seeks to reduce his term of supervised release through the award of good time credits, the Court will dismiss that request as moot.").

    Therefore, the undersigned **FINDS** that the collateral consequences exception to the mootness doctrine does not apply to this case, as Ford is not substantively challenging his underlying sentence, but instead merely seeking to challenge the results of a disciplinary hearing, which, even if pursued successfully, would have no effect on his term

of supervised release.

### B. Exception to Mootness—Capable of repetition yet evading review

The second exception to the general mootness doctrine, met when there is a reasonable expectation that the same petitioner will be subjected to the same wrongful action again, is likewise not applicable to this petition. *Leonard,* 804 F.2d at 842. As Ford has been released from custody, "there is no reasonable expectation that [he] will be incarcerated again and face the same set of circumstances in the future." *Maultsby v. Rickard*, No. 1:17-CV-04612, 2018 WL 4289648, at *2 (S.D.W. Va. June 29, 2018), *report and recommendation adopted*, No. CV 1:17-04612, 2018 WL 4291740 (S.D.W. Va. Sept. 6, 2018). Indeed, it is implausible that Ford will again be incarcerated and again be subjected to the same purportedly unconstitutional disciplinary proceeding. *See e.g. Incumaa*, 507 F.3d at 289.

In summary, the undersigned **FINDS** that Ford's habeas petition raises a claim that is now moot, and neither exception to the general mootness doctrine applies to Ford's challenge to the disciplinary proceeding at issue in this petition. The only relief that this Court could grant to Ford, he has already received. To the extent that Ford believes the allegedly improper sanction should serve as a reason to reduce his term of supervised release, he must pursue this claim as a request for modification in the sentencing court.

### IV. Proposal and Recommendations

For the aforementioned reasons, the undersigned respectfully **PROPOSES** that the District Court confirm and accept the foregoing findings and **RECOMMENDS** that the presiding District Judge **GRANT** Respondent's request for dismissal, (ECF No. 10); **DISMISS** the Petition for a Writ of Habeas Corpus, (ECF No. 2); and **REMOVE** this matter from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Frank W. Volk, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, Petitioner shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown. Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Volk, and Magistrate Judge Eifert.

The Clerk is instructed to provide a copy of this "Proposed Findings and Recommendations" to the Petitioner and to counsel of record.

**FILED:** August 10, 2021

_____
Cheryl A. Eifert
United States Magistrate Judge